COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Fitzpatrick, Judges Frank and Clements

COURTNEY M. DAVIS

                                        MEMORANDUM OPINION[*]
v.       Record No. 0875-04-3                PER CURIAM
                                        SEPTEMBER 14, 2004

LYNCHBURG DEPARTMENT OF
 SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
J. Leyburn Mosby, Judge

(Dion F. Richardson, on brief), for appellant.

(Eleanor A. Putnam Dunn, Assistant City Attorney; James J. Angel,
Guardian *ad Litem* for the infant child, on brief), for appellee.


        Courtney M. Davis appeals a decision of the trial court terminating her parental rights to

her daughter, L.D., pursuant to Code § 16.1-283(B) and (C).  Appellant contends that her

behavior did not present a serious and substantial threat to L.D.'s life, health or development and

that the conditions resulting in the neglect were substantially corrected.  Upon reviewing the

record and briefs of the parties, we conclude this appeal is without merit.  Accordingly, we

summarily affirm the decision of the trial court.  See Rule 5A:27.

                                BACKGROUND

        We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

So viewed, the evidence established that in September 2001, appellant and L.D. lived with appellant's mother and brother. Appellant was sixteen years old, and L.D. was five months old. Appellant and her brother fought daily and during one fight, appellant kicked her brother in the ribs while he was on the floor playing with L.D. Appellant then picked up L.D. and continued to fight with her brother. According to appellant's mother, appellant threw L.D. during the fight. Appellant went to the magistrate's office to take out a warrant against her brother, and Investigator Thomas saw appellant. Thomas testified that appellant was screaming and was shaking to the point that L.D., who was in appellant's arms, was also shaking.[1] Thomas also noticed that L.D.'s eye was swollen. Appellant and L.D. were transported to the hospital, and a social worker saw appellant at the hospital. Appellant told the social worker that she fought with her brother every day and "[i]t's dangerous for the baby." The Lynchburg Department of Social Services (DSS) removed L.D. from appellant's custody and later removed appellant from her mother's custody. DSS made two consecutive foster home placements with appellant and L.D. together. DSS also arranged for appellant to receive intensive community services for anger management, parenting instruction, counseling and education. However, appellant was removed from the two foster homes because she mistreated L.D. and failed to follow rules. L.D. was then placed in a foster home apart from appellant.

On January 9, 2002, Dr. Anderson, a clinical psychologist, evaluated appellant. Dr. Anderson found that appellant had "limited intellectual resources, significant emotion and personality disturbance, inadequate understanding of child development and principles of parenting, and a highly problematic or dysfunctional relationship with her infant daughter."

---

[1] Appellant was determined to be the primary aggressor in the September 2001 altercation and was subsequently convicted of domestic assault.

Dr. Anderson predicted that appellant would be "antagonistic and oppositional" with treating professionals.

In February 2002, the court ordered appellant to complete the program at Jackson Field Homes, a residential treatment center, where she received a customized treatment plan. By March, appellant was refusing to cooperate with personnel from the offered services and was argumentative and verbally abusive. In May 2002, appellant's social worker, her guardian *ad litem* and her therapist met with appellant and discussed a service contract that specified what would be required of appellant before DSS would recommend returning D.L. to her. Appellant said she understood the contract and signed it. However, after appellant signed the contract, her behavior did not improve and she made no progress on the requirements in the contract, but instead threatened the staff at Jackson Field Homes, assaulted a resident and stole a cell phone. Appellant was terminated from the program at Jackson Field Homes due to her behavior.

Appellant was then admitted to the juvenile psychiatric ward at Virginia Baptist Hospital, where she received a customized treatment plan to help with anger management, coping skills, appropriate conduct and other specific needs. Appellant initially cooperated with the treatment plan, but later stopped cooperating and attacked the staff of the ward. Appellant was discharged from the psychiatric ward because of her dangerous behavior and her failure to cooperate. Appellant's behavior at the psychiatric ward resulted in two convictions for assault and battery.

In August 2002, a court-ordered evaluation at the Commonwealth Center for Children and Adolescents (the Commonwealth Center) provided that appellant was extremely aggressive and dangerous. The Commonwealth Center determined appellant was "fully aware of what she was doing" and "was not willing to comply with treatment to get better." The Commonwealth Center recommended that appellant be placed "in a secure locked setting that could hold [appellant] accountable for her actions." Appellant was committed to the Department of Juvenile

Justice, but was returned to her mother's home on December 2, 2002, where she was involved in frequent fights with her brother. After appellant turned eighteen years of age, she declined services for independent living. At the termination hearing, appellant testified she was pregnant, living with her grandmother and spent her time baby-sitting and crocheting.

When L.D. was placed in the foster home apart from appellant she was evaluated by Deborah Maxey, a licensed counselor. Maxey testified that L.D. was a "very traumatized child," had post-traumatic stress disorder and was suffering from a variety of physical ailments, including hair loss and respiratory problems caused by stress. L.D. was also developmentally delayed. Maxey testified that L.D.'s response to the stress was severe disassociation, which is a "brain injury to a child of this age." Maxey explained that "[i]f a child learns to disassociate within the first three years of life, it's usually from extreme neglect or abuse and trauma." Maxey testified that if a child disassociates as a coping technique, there is a strong probability that, as an adult, he/she will develop a personality disorder or borderline personality disorder. Maxey found that the foster family was "extremely sensitive to [L.D.]" and took care of her "trauma needs." Maxey testified L.D. had developed a "very healthy attachment" to her foster parents and by December 2, 2003, when the trial court heard the matter, L.D. had developed into a "normal little girl." However, L.D. continued to be a special needs child and required a sensitive caretaker.

ANALYSIS

Appellant contends the trial court erred in finding that the neglect suffered by L.D. presented a serious and substantial threat to L.D.'s life, health or development. She argues the incident that resulted in DSS taking custody of L.D. was an isolated one and did not present a serious and substantial threat to L.D.'s life, health or development.

Code § 16.1-283(B) requires proof, by clear and convincing evidence that "[t]he neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development" and "[i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time."

In this case, clear and convincing evidence proved that L.D. was the victim of domestic violence that was a pattern of ongoing trauma, which resulted in significant psychological damage and adverse physical effects. DSS removed L.D. from appellant's custody after a fight between appellant and her brother. During the fight with her brother, appellant threw L.D. to the floor. Appellant went to the magistrate's office, where she was screaming and shaking to the point that L.D., who was in appellant's arms, was also shaking. L.D. had a swollen eye and was transported to the hospital. Appellant was later convicted of assaulting her brother. Appellant told the social worker at the hospital that she fought with her brother every day and it was dangerous for L.D. DSS made two consecutive foster care home placements with appellant and L.D. together, but both were terminated because appellant mistreated L.D. and failed to follow rules.

When L.D. was placed in foster care apart from appellant, L.D. had post-traumatic stress disorder, was developmentally delayed and suffered hair loss and respiratory problems, which were all caused by chronic stress. L.D.'s response to the stress was severe disassociation. An expert explained that when a child learns to disassociate within the first three years of life, it's usually from extreme neglect or abuse and trauma. The expert testified that if a child disassociates as a coping technique, there is a strong probability that, as an adult, he/she will develop a personality disorder or borderline personality disorder.

The evidence clearly demonstrated that the September 2001 incident was serious and, by appellant's own admission, was not an isolated incident, but a pattern of ongoing violence. The trauma suffered by L.D. and caused by appellant's actions presented a serious and substantial threat to her life, health or development.

Appellant also contends the trial court erred in finding that she failed to substantially remedy the conditions which led to L.D.'s foster care placement. She argues she is living with her grandmother, is employed and is doing well.

Code § 16.1-283(C)(2) requires proof, by clear and convincing evidence, that (a) the termination is in the best interests of the child, (b) "reasonable and appropriate" services have been offered to help the parent "remedy substantially the conditions which led to or required continuation of the child's foster care placement," and, (c) despite those services, the parent has failed, "without good cause," to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care."

The record supports the trial court's finding that appellant failed to substantially remedy the conditions that led to L.D.'s foster care placement. DSS twice placed appellant and L.D. in foster care homes and arranged for services for appellant in anger management, parenting instruction, counseling and education. However, appellant failed to abide by the terms of the placement, failed to participate in the services provided, and was removed from the foster homes. DSS then placed appellant at Jackson Field Homes with a customized service plan. However, within one month, appellant refused services and abused the staff. In May 2002, appellant's social worker, her guardian *ad litem* and her therapist from Jackson Field Homes met with appellant and discussed a service contract that specified what would be required of her before DSS would recommend returning D.L. to her. Appellant failed to make any progress with the requirements of the service contract, but abused the staff at Jackson Field Homes and assaulted a

resident, resulting in her dismissal. Appellant then was placed in a psychiatric ward of a hospital with a customized treatment plan, but she refused to cooperate with her treatment and she abused the staff. Appellant was discharged from the psychiatric ward and placed at a detention center. A court-ordered evaluation by the Commonwealth Center concluded that appellant was extremely aggressive and dangerous. The Commonwealth Center determined appellant was "fully aware of what she was doing" and "was not willing to comply with treatment to get better." Appellant was released from the Department of Juvenile Justice and returned to her mother's home, where she was involved in frequent fights with her brother. After appellant turned eighteen years of age, she declined services for independent living.

The evidence demonstrated that appellant failed to make any progress in any of her placements, despite multiple services specifically designed to address her needs. Appellant presented no evidence to support her argument that her behavior problems had been addressed. She merely testified that she was pregnant, living with her grandmother and spent her time baby-sitting and crocheting. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

The record supports the trial court's finding that DSS presented clear and convincing evidence satisfying the statutory requirements of Code § 16.1-283(B) and (C) and that the termination of appellant's parental rights was in D.L.'s best interest. Accordingly, we summarily affirm the decision of the trial court.

Affirmed.